UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KENDRA M. DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:13-cv-01993-TWP-TAB |
| ) | |
| CAROLYN W. COLVIN, Commissioner of ) | |
| the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Kendra M. Davis ("Ms. Davis") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and for Supplemental Security Income ("SSI") under Title XVI of the Act.[1] For the following reasons, the Court **AFFIRMS** the decision of the Commissioner.

### I.   BACKGROUND

**A.    Procedural History**

On February 9, 2011, Ms. Davis filed applications for DIB and SSI, alleging a disability onset date of March 1, 2010. Her claims initially were denied on March 23, 2011, and again on reconsideration on June 23, 2011. Ms. Davis filed a written request for a hearing on July 5, 2011. On May 14, 2012, a hearing was held before Administrative Law Judge Blanca B. de la Torre (the "ALJ"). Ms. Davis participated in the hearing and was represented by counsel. On August 30,

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.


2012, the ALJ denied Ms. Davis's applications for DIB and SSI. On October 18, 2013, the Appeals Council denied Ms. Davis's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. On December 17, 2013, Ms. Davis filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.     Factual Background**

At the time of her alleged disability onset date, Ms. Davis was 22 years old, and she was 24 years old at the time of the ALJ's decision. Ms. Davis completed high school and later attended college at Ivy Tech Community College for one year. During her attendance at Ivy Tech, Ms. Davis played basketball and worked two part time jobs while caring for her young daughter. During the previous few years, Ms. Davis had worked numerous part time jobs and a couple of full time jobs as a retail cashier, retail assistant manager, warehouse packager, and medical records file clerk. At the time of the administrative hearing in May 2012, Ms. Davis was employed by Wishard Hospital as a part time medical records file clerk and had been employed as such for almost a year. Her work did not require much heavy lifting or excessive walking. Ms. Davis asserts that she has been unable to hold employment continuously or on a full time basis because of her asthma, allergies, anxiety, and inability to work and interact with others. She takes various medications to address her anxiety, sleeplessness, and asthma.

As early as 2009, Ms. Davis started struggling with asthma. In February 2009, Ms. Davis went to the hospital because she was having difficulty breathing as a result of an asthma attack. She was anxious because of her difficulty with breathing. She was given medication to help with breathing. A chest x-ray revealed clear lungs and no pleural effusions, with only minor post granulomatous calcifications. Ms. Davis was again treated at the hospital for asthma attacks in

April 2010, May 2010, and June 2010. She generally was able to control her asthma with an inhaler and nebulizer.

As early as May 2010, Ms. Davis's medical records noted an assessment of nervousness or anxiety. On May 19, 2010, Amber Miller ("Ms. Miller"), a physician's assistant at Oliver Family Healthcare, assessed Ms. Davis for complaints of asthma and chest pain. Ms. Miller noted that Ms. Davis had no known allergies, and her chest and lung examinations were normal. Ms. Miller noted that Ms. Davis showed signs of nervousness. She recommended a follow-up appointment in two weeks. Ms. Davis again presented to Ms. Miller on two occasions in June 2010 and once in July 2010 because of asthma and anxiety, which affected her ability to sleep at night. Ms. Davis made some adjustments to her medications. Ms. Miller continued to note that Ms. Davis had no known allergies, and her chest and lung examinations were normal. The July 2010 medical record noted improvement with anxiety but continued nervousness.

On August 3, 2010, Ms. Davis visited Ms. Miller because of asthma and a complaint of an allergic reaction to some food. Ms. Miller noted that Ms. Davis continued to have anxiety, but Ms. Davis reported that her stress level was improving with the use of medication. While again no known allergies were reported and chest and lung examinations were normal, Ms. Miller recommended that Ms. Davis be seen by an allergist.

Vicki Shelton ("Dr. Shelton"), an allergist, met with Ms. Davis in August 2010 and noted her nasal allergies, possible food allergies, and asthma. At Ms. Davis's request, Dr. Shelton arranged for allergy testing, which revealed some food and dust allergies.

Ms. Davis presented to her primary care physician's office in January 2011 because of a headache, and it was noted that she was using her inhaler and breathing better. No known allergies were reported. There was no note of anxiety or nervousness. She again presented to her primary

care physician's office in February 2011 and was seen by Ms. Miller. She reported to Ms. Miller that her asthma flared up while she was at work. Ms. Miller again noted that Ms. Davis was experiencing nervousness, had normal chest and lung examinations, and had no known allergies. Ms. Davis again reported that her stress level was improving with the use of medication.  In her medical note from the February 2011 appointment, Ms. Miller explained that Ms. Davis "is able to work but is recommended to work in a more allergen and temperature controlled environment." ([Filing No. 13-7 at 67](Filing No. 13-7 at 67).)

During a follow-up visit with Ms. Miller on March 2, 2011, Ms. Davis reported that her asthma was aggravated by dust.  Ms. Miller noted that Ms. Davis was not in any acute distress and that she was being treated weekly with allergy injections through Dr. Shelton's office.

At the administrative hearing in May 2012, Ms. Davis reported that she had not been to the hospital for her asthma recently because she was using her nebulizer to treat her asthma.  She used her nebulizer at nighttime about two or three times a week.

Ms. Davis underwent a mental status evaluation on March 16, 2011.  This was conducted by Herbert Henry, Ph.D. ("Dr. Henry").  Ms. Davis reported to Dr. Henry that she experienced anxiety attacks because of her asthma attacks.  When her allergies triggered her asthma, then she would also experience anxiety.  She reported that she was allergic to everything and that she was unable to work because of her asthma and allergies.  Ms. Davis explained that she had difficulty sleeping because she was afraid she would die in her sleep because of her asthma.  When Dr. Henry asked Ms. Davis if she thought she needed mental health treatment, she responded, "no."  While Ms. Davis had not yet received mental health treatment, she was taking medication prescribed by her primary care physician for her anxiety.  Dr. Henry determined that Ms. Davis was not unable

4

to work due to mental health problems. He diagnosed her with anxiety disorder and borderline intellectual functioning and assigned her a global assessment of functioning ("GAF") score of 70.

On June 22, 2011, Ms. Davis began receiving mental health treatment at the Midtown Clinic. She first met with Tashauna Buchanan ("Ms. Buchanan"), a mental health counselor at the Midtown Clinic, for an initial intake assessment. She described her depression and anxiety to Ms. Buchanan. They determined that psychotherapy would be beneficial and scheduled individual therapy for Ms. Davis.

On July 18, August 2, and August 16, 2011, Ms. Davis participated in individual therapy sessions with Ms. Buchanan. She reported concerns about time, money, schooling, work, asthma, allergies, and taking care of her daughter. Ms. Davis cancelled her September 6, 2011 therapy session because of her busy schedule. Ms. Davis again met with Ms. Buchanan on December 5 and December 19, 2011.

Ms. Davis underwent an initial "MD" evaluation with Kimberly Mayrose, M.D. ("Dr. Mayrose") on December 22, 2011 (Filing No. 13-8 at 48). Ms. Davis reported struggling with depression and anxiety. She explained that she does not like to be around people, has difficulty sleeping because of fears associated with her asthma, and has low energy. She used an inhaler multiple times a day and a nebulizer to help with her asthma. She reported having little time and money, and she was working two jobs and attending college. Ms. Davis explained to Dr. Mayrose that she deals with stress by working. Her mental status examination was normal. Dr. Mayrose diagnosed Ms. Davis with depression and likely general anxiety disorder. She assigned Ms. Davis a GAF score of 55. Dr. Mayrose prescribed Celexa, an antidepressant, to begin treating Ms. Davis's symptoms.

On January 9, 2012, Ms. Davis had a therapy session with Ms. Buchanan, and she reported that she was fearful in social settings but was able to attend her sister's birthday party. She also reported that she had passed her college classes and was planning to continue with her schedule of school, basketball, and part time work. Ms. Davis noted that she would drop basketball if she were offered a full time job. Ms. Buchanan recorded that Ms. Davis was cheerful and positive and that she had not yet started taking her new medications because she did not have money to pay for them. Another therapy session was scheduled for January 30, 3012; however, Ms. Davis did not attend the scheduled appointment.

On April 9, 2012, Ms. Davis met with Leela Rau, M.D. ("Dr. Rau"), at the Midtown Clinic. She reported that she was a full time college student, but she had not been to class the previous three weeks and was thinking about dropping out. She was not having suicidal thoughts, but she was not sleeping well and was having crying spells. Ms. Davis reported that she did not start taking her Celexa because when she took it previously it caused her to shake. Dr. Rau prescribed Effexor to help with anxiety and depression. Her mental status examination was normal with a sad affect and depressed mood.

During her visit with Dr. Mayrose on May 1, 2012, Ms. Davis reported that she felt the same as before, she was not motivated, and her energy was "so-so." She also reported that she dropped out of college after spring break. She reported to Dr. Mayrose that she was working at Wishard Hospital, she did not want to deal with people because they were getting on her nerves, and she wanted to stay in her house. While she reported that she did not want child support from her daughter's father and wanted to financially take care of everything herself, Ms. Davis also noted that she was applying for disability benefits for her anxiety and depression (Filing No. 13-8

at 59). Dr. Mayrose completed a mental status examination, which produced normal results. Still, Dr. Mayrose assigned Ms. Davis a GAF score of 50.

At the administrative hearing on May 14, 2012, Ms. Davis testified that she was able to hold only part time employment because of her asthma and inability to interact with other people. She testified that she did not have any physical limitations that impaired her ability to sit or lift while at work. She testified that she was then currently working at Wishard Hospital as a part time file clerk, but her first month of employment was full time. Ms. Davis testified that she is usually able to control her asthma with her inhaler and nebulizer, and that if it gets very severe, she goes to the hospital. Her panic attacks, or anxiety, coincide with her severe asthma attacks. She explained that she flunked out of college because she was not able to be around people, and then she tried to attend college a second time a few years later. Ms. Davis also testified that she is able to sleep four or five hours a night, wake up, and get her daughter ready for preschool and take her there. She testified that her psychotherapist noted that she is making progress. During the hearing, Ms. Davis had a headache and cried intermittently.

Following the administrative hearing, Ms. Davis was referred to undergo a psychological examination. This examination was conducted on May 31, 2012, by Howard E. Wooden, Ph.D. ("Dr. Wooden"). Dr. Wooden's impressions from the evaluation were that Ms. Davis is mildly slow cognitively with borderline to low average intellectual functioning and suffers from anxiety disorder with mild to moderate episodic panic. He assigned Ms. Davis a GAF score of 75 (Filing No. 13-8 at 70). Dr. Wooden noted that Ms. Davis reported her primary hindrance to working was asthma and allergies, but sleep deprivation also was a problem. Ms. Davis's counsel reviewed and responded to Dr. Wooden's report, which was then made part of the record.

7

As part of her daily activities and social functioning, Ms. Davis functions independently. She is able to get herself and her young daughter ready for the day each morning. She drives her daughter to preschool. She prepares breakfast, does laundry, cleans her home, prepares lunch and dinner, watches television, and exercises. She is able to manage her medications, personal hygiene, and finances without assistance. She enjoys bowling, playing cards, watching television, and exercising. Ms. Davis also is able to work part time throughout the week. She is able to shop at the store for groceries, household items, and personal items without assistance. Ms. Davis attends church weekly and takes her daughter to various activities. She also goes out for dinner.

## II.  DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after he establishes that he is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At

step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d

1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III.  THE ALJ'S DECISION

The ALJ first determined that Ms. Davis met the insured status requirement of the Act through December 31, 2015. The ALJ then began the five-step disability analysis. At step one, the ALJ found that Ms. Davis has not engaged in substantial gainful activity since March 1, 2010, the alleged onset date of disability. The ALJ found that Ms. Davis worked after the alleged disability onset date but that her work activity did not rise to the level of substantial gainful activity. At step two, the ALJ found that Ms. Davis has the following severe impairments: asthma, anxiety, and borderline intellectual functioning. At step three, the ALJ concluded that Ms. Davis does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Ms. Davis has an RFC to:

> perform a full range of work at all exertional levels but with the following non-exertional limitations: She cannot climb ladders, ropes, or scaffolds. She cannot be exposed to extreme heat, extreme cold, dust, gases, fumes, or other lung irritants. She cannot be exposed to hazards, including unprotected heights and dangerous equipment. The claimant can understand, remember, and carryout short, simple and repetitive instructions. She is able to sustain attention and concentration for 2 hours at a time and for 8 hours in the 8-hour workday. She can use judgment to make work-related decisions commensurate with short, simple, repetitive tasks. The claimant cannot have contact with the public but is able to have occasional and superficial interaction with supervisors or coworkers. The work should not have unusual stresses.

([Filing No. 13-2 at 16](#).)

At step four, the ALJ determined that Ms. Davis is unable to perform her past relevant work as a retail cashier, retail assistant manager, warehouse packager, or medical records file clerk because the demands of her past relevant work exceed her RFC. At step five, the ALJ determined that Ms. Davis is not disabled because there are jobs that exist in significant numbers in the national economy that Ms. Davis could perform with her RFC. The ALJ denied Ms. Davis's applications for DIB and SSI because of the determination that Ms. Davis is not disabled.

## IV.  DISCUSSION

In her request for judicial review, Ms. Davis asserts that the ALJ erred (1) in determining that she was not disabled because her depression and anxiety did not meet or medically equal a listed impairment, (2) by failing to summon a medical advisor to testify concerning her mental health impairments, (3) by failing to make any credibility determination, and (4) in determining that she was not disabled because she could perform some jobs in the economy.

**A.  Substantial evidence supports the ALJ's decision that Ms. Davis's impairments do not meet or medically equal any listed impairment.**

Ms. Davis argues that the ALJ's decision must be reversed because there is not substantial evidence to support the decision that her severe impairments did not meet or medically equal a

listed impairment. As the basis for her argument, Ms. Davis asserts that the ALJ ignored the lower GAF scores of 50 and 55 assigned to her by Dr. Mayrose. Ms. Davis argues that the GAF score of 50 indicated that she was totally disabled. However, "[a]s has been oft-repeated by courts in this circuit, GAF scores are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability." *Wimmer v. Colvin*, 2014 U.S. Dist. LEXIS 16594, at *16 (N.D. Ind. Feb. 11, 2014) (internal citation and quotation marks omitted).

Ms. Davis's argument ignores the many pages of analysis that the ALJ completed when reviewing the medical record in this case. The ALJ reviewed and considered the evaluations of Dr. Mayrose and the evaluations of the earlier State agency physicians and psychologists. The ALJ reviewed the assessments and treatment notes from Dr. Rau, Ms. Miller, and Ms. Buchanan. The ALJ reviewed and considered the mental health evaluation completed by Dr. Henry.

Kenneth Neville, Ph.D. ("Dr. Neville"), a State agency psychologist, conducted a psychiatric review technique of Ms. Davis on March 22, 2011. Dr. Neville determined that Ms. Davis's anxiety was not severe and that she was only mildly limited in her daily activities, social functioning, and maintenance of concentration, persistence, and pace. He noted that Ms. Davis had no episodes of decompensation. Dr. Neville's assessment was affirmed by another State agency psychologist, J. Gange, Ph.D. ("Dr. Gange"), on June 16, 2011. The ALJ gave only limited weight to the expert opinions of Dr. Neville and Dr. Gange regarding Ms. Davis's mental health impairments. The ALJ specifically stated that limited weight was given to those opinions because of the longitudinal evaluation of Ms. Davis's impairments with due consideration being given to Dr. Mayrose's opinions and findings. After considering all of the evidence, the ALJ did not agree with the State agency experts that Ms. Davis's impairments were not severe. Rather, the ALJ determined that her impairments were severe but not disabling.

Additionally, J.V. Corcoran, MD ("Dr. Corcoran"), a State agency physician, conducted a physical residual functional capacity assessment of Ms. Davis on March 10, 2011.  Dr. Corcoran opined that Ms. Davis had no exertional, postural, manipulative, visual, or communicative limitations to her ability to work.  He opined that she had no environmental limitations to her ability to work with the exception of avoiding concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  Dr. Corcoran noted that the severity of Ms. Davis's symptoms were not consistent with the medical evidence in her file.  Dr. Corcoran's assessment was affirmed by another State agency physician, B. Whitley, M.D., on June 23, 2011.  Similar to the ALJ's treatment of Dr. Neville's and Dr. Gange's expert opinions, the ALJ gave only limited weight to the expert opinions of Dr. Corcoran and Dr. Whitley regarding Ms. Davis's physical limitations.  The ALJ specifically stated that limited weight was given in light of Ms. Davis's testimony and the updated record.

The ALJ even directed that Ms. Davis undergo a psychological examination after the administrative hearing to assist in making a disability determination.  Dr. Wooden completed that evaluation, and Ms. Davis's counsel reviewed and responded to Dr. Wooden's report.  The report and response were made part of the record, and the ALJ consider this evidence as well.

The ALJ considered all of the evidence when determining whether Ms. Davis's impairments met or medically equaled a listed impairment.  The ALJ properly executed her responsibility of making the final disability determination, and substantial evidence supports her decision.  This Court will not reweigh that evidence.

**B.     The ALJ did not err by not summoning a medical advisor at the hearing.**

Ms. Davis asserts that the ALJ's decision must by reversed because the ALJ failed to summon a medical advisor to testify at the hearing regarding Ms. Davis's mental health impairments. She argues that the ALJ based her decision solely on her own "layperson's opinion" by simply assuming the impairments did not medically equal any listed impairment instead of relying on medical opinion. Ms. Davis relies on *Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2004) and *Green v. Apfel*, 204 F.3d 780 (7th Cir. 2000) for her argument. Ms. Davis's counsel made this same argument based on these same cases in *Sellinger v. Astrue*, 2011 U.S. Dist. LEXIS 99904 (S.D. Ind. Sept. 6, 2011). In *Sellinger*, the court explained that an ALJ is not always required to summon a medical advisor. Where the medical evidence is sufficient to allow an ALJ to make an informed determination, it is not necessary to call a medical advisor to testify at the hearing. *Id.* at *24–27. Similar to the *Sellinger* case, in Ms. Davis's case here:

> The ALJ's opinion in Ms. [Davis's] case and the administrative record bear no resemblance to the facts in *Barnett* [or *Green*]. This ALJ identified the listings [s]he considered and [s]he discussed in detail [her] analysis of the medical records and the reasons [s]he found that Ms. [Davis] did not meet or equal any listings. Further, the administrative record reflects that agency physicians had opined that Ms. [Davis's] physical and mental impairments did not satisfy, or medically equal, any listings.

*Id.* at *26. The ALJ did not commit error in failing to summon a medical advisor to testify at Ms. Davis's hearing because there was substantial medical evidence in the record to make an informed determination. Therefore, this is not a basis for reversal of the ALJ's decision.

**C.     The ALJ's credibility determination was not patently wrong.**

Ms. Davis next argues that the ALJ failed entirely to make any credibility determination regarding Ms. Davis's allegations of her impairments. She then asserts that the ALJ, by failing to make any credibility determination, made an implied, negative credibility determination. When considering challenges to an ALJ's credibility determination, the court must determine whether

the ALJ's credibility finding was "patently wrong," *Powers v. Apfel*, 207 F.3d 431, 435–36 (7th Cir. 2000), meaning that it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

Ms. Davis is mistaken in her belief that the ALJ failed to make any credibility determination. The ALJ summarized Ms. Davis's impairments on page seven of her decision. Then the ALJ explained that she would "now evaluate the claimant's allegations in light of the totality of the record." (Filing No. 13-2 at 17.) Following a thorough assessment of Ms. Davis's medical history and treatment, the ALJ considered and discussed the credibility factors on pages ten through twelve of the decision.

The ALJ considered Ms. Davis's alleged symptoms and impairments, factors that mitigated or aggravated her symptoms, her limited and conservative treatment history, the normal results from asthma diagnostic testing, the normal results from x-rays, and the normal results from mental status evaluations. The ALJ considered the various statements made by Ms. Davis to her medical providers, which statements were noted in her medical records. The ALJ considered Ms. Davis's broad range of daily activities, her level of social functioning, and her ability regarding concentration, persistence, and pace. The ALJ also considered the fact that Ms. Davis had worked multiple jobs and was working at the time of the hearing. The ALJ specifically explained how the record evidence supported each of the limitations included in the RFC determination, and she stated as she considered each credibility factor that the evidence was consistent with the RFC determination. The ALJ's credibility determination was not without explanation or support and was not patently wrong.

**D.    Substantial evidence supports the ALJ's decision that Ms. Davis could perform some jobs in the economy based on her RFC.**

Finally, Ms. Davis argues that the ALJ's decision at step five of the disability analysis was not supported by substantial evidence. She asserts that the ALJ erred by determining her RFC based on a part time work schedule, not on a full time, eight-hours-a-day, five-days-a-week schedule. She also asserts that the ALJ did not account for her mental health impairments when presenting a hypothetical question to the vocational expert thereby undermining the vocational expert's opinion regarding Ms. Davis's ability to perform work available in the economy.

Ms. Davis argues that instead of following Social Security Ruling 96-8p, "which requires a residual functional capacity assessment to be based on full time work, this ALJ stated 'her ongoing part-time work demonstrates that she is able to work and demonstrates greater capacity than alleged in these proceedings.'" (Filing No. 17 at 16 (quoting the ALJ's decision at Filing No. 13-2 at 22).) However, Ms. Davis's argument takes this statement of the ALJ out of context and ignores the other evidence considered by the ALJ when making her RFC and disability determinations. This quoted statement from the ALJ's decision was part of the ALJ's consideration of "other factors" for determining credibility. The ALJ noted that the evidence, including the fact that Ms. Davis was working part time, supported her very specific RFC determination, which included detailed limitations. The Court finds no error in the ALJ's consideration of Ms. Davis's part time employment as one factor of many in her determinations.

Next, Ms. Davis asserts that the ALJ's hypothetical question presented to the vocational expert was flawed because it limited the hypothetical claimant to simple and repetitive tasks and did not fully account for Ms. Davis's mental health impairments. However, the limitation to "simple and repetitive tasks" was only one of many limitations that the ALJ presented in her hypothetical question to the vocational expert. She also included other limitations such as work requiring concentration for only two hour periods at a time in an eight hour work day, limited

16

requirements to make work decisions, no contact with the public and only occasional and superficial contact with supervisors and coworkers, and no unusual stresses. These limitations accounted for Ms. Davis's mental health impairments. Thus, the hypothetical question presented to the vocational expert was indicative of Ms. Davis's impairments, and therefore was reliable to elicit substantial evidence from the vocational expert to support the ALJ's determination that work existed in the economy that Ms. Davis could perform with her RFC. The ALJ did not err on this basis.

The ALJ's RFC, credibility, and disability determinations were supported by substantial evidence. Having determined that Ms. Davis has an RFC to perform work that exists in significant number in the national economy, the ALJ concluded that Ms. Davis is not disabled.

## V.   CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**. Ms. Davis's appeal is **DISMISSED**.

**SO ORDERED.**

Date: ___6/1/2015_____

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov